# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

UNITED STATES OF AMERICA,        )
                                  )
            Plaintiff,            )   Case No. 2:08-cr-00134-PMP-PAL
                                  )
vs.                               )   **REPORT OF**
                                  )   **FINDINGS AND RECOMMENDATION**
OMAR URIARTE-FELIX,               )
                                  )   (M/Suppress - Dkt. #70)
            Defendant.            )
_____ )

Before the court is defendant Omar Uriarte-Felix's Motion to Suppress (Dkt. #70), which was referred to the undersigned for a report of findings and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and LR IB 1-4. The court conducted an evidentiary hearing on February 13, 2009. The court has considered the motion, the Government's Response (Dkt. #82), the evidence adduced, and arguments of counsel at the evidentiary hearing.

## BACKGROUND

On May 13, 2008, the grand jury returned a two-count Indictment (Dkt. #25) against Omar Uriarte-Felix ("Uriarte"), charging him with conspiracy to distribute cocaine in violation of 21 U.S.C. §§ 846 and 841(a)(1) and (b)(1)(A)(ii), and possession of cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A)(ii). Uriarte was arrested on April 27, 2008 after a search warrant was executed at his residence at 907 Carnival Street in North Las Vegas, Nevada, which recovered 5,220 grams of cocaine and approximately $90,000 in U.S. currency.

///
///
///
///

# DISCUSSION

I. **The Parties' Positions.**

　　A. **Uriarte's Motion to Suppress**

Uriarte seeks to suppress the drugs and currency found in his home, arguing officers used information obtained during the warrantless entry of his residence to support the state-issued search warrant. Although the police report produced in discovery in this case and the telephonic search warrant indicate that Uriarte consented to an initial search of his residence, Uriarte claims in his written motion that officers told Uriarte they wanted to search his residence and were having a search warrant delivered. He disputes that he consented to a search of the residence and claims the officers entered the residence, and he merely acquiesced to their presence. His wife, infant daughter, and mother-in-law were present at the time the officers entered. Uriarte claims that he told the officers he was watching drugs and money for another individual and showed the officers a secret compartment in a vehicle parked in his garage only after he was told that his family would be arrested and his child taken to Child Protective Services ("CPS"). Uriarte seeks to suppress evidence derived from the search, arguing the initial warrantless entry was not pursuant to a valid consent. As such, the initial entry and search was illegal and, therefore, officers could not rely upon anything observed during their initial warrantless entry to support the search warrant. He argues that all of the evidence recovered from his home, as well as his post-search and post-arrest statements must be suppressed as the "fruit of the poisonous tree." Counsel for Uriarte requested a *Franks* hearing to determine whether the telephonic affidavit supporting the application for the search warrant at his residence "contains illegally-obtained information, fails to support a finding of probable cause, or is otherwise defective."

　　B. **The Government's Response**

The government asserts that the initial search of Uriarte's home was a valid consensual search conducted only after Uriarte voluntarily consented both verbally and in writing. The government claims that after signing a written consent to search form, Uriarte reentered his home, closed the door, locked it, and remained inside for a short period of time. Uriarte then returned, opened the door, and let officers in. This conduct, it is asserted, demonstrates Uriarte knew he could refuse to consent. The government also contends that the officers applied for and received a search warrant in an abundance of

1  caution although they were not required to do so after receiving Uriarte's consent and that the search
2  warrant was supported by ample probable cause. In the alternative, the government argues that even if
3  probable cause was lacking, the officers relied on the search warrant in good faith. The government
4  opposed Uriarte's request for a *Franks* hearing because Uriarte did not make a substantial preliminary
5  showing that the affiant of the search warrant, Officer Shane Skipworth, intentionally or recklessly
6  mislead the issuing magistrate.

## II. Evidence Before the Court

The court conducted a telephonic status conference with counsel for defendant Uriarte, co-defendant Alexander Mercado, and counsel for the government on January 15, 2009 on the parties' request to continue the originally-scheduled evidentiary hearing. The court also clarified the scope of the evidentiary hearing that would be would conducted. With respect to Uriarte, the court granted an evidentiary hearing to determine whether the government could meet its burden of establishing he consented to the initial warrantless entry of his residence and related issues concerning the scope of the consent, and defendant's claims that information obtained during the initial entry was the "fruit of the poisonous tree" which could not be used to support the search warrant. After being advised that the court would conduct an evidentiary hearing on these issues, counsel for Uriarte withdrew his request for a *Franks* hearing.

### A. Testimony of Sergeant George Middlebrook

Middlebrook has been employed as a sergeant in the narcotics unit of the North Las Vegas Police Department ("NLVPD") for approximately four years and is part of a DEA drug task force. In April 2008, he was involved in an investigation concerning Javier Reyes, a co-defendant in this case. Middlebrook obtained a Title III wiretap on Reyes' phone which was in place for approximately one week. There were a number of intercepted telephone conversations in English concerning narcotics and drug sales. Much of the conversation was in "coded language" which, based on Middlebrook's experience, is typical for calls concerning the sale and trafficking of drugs.

One of the calls that was intercepted was a call between Reyes and co-defendant Alexander Mercado which discussed making a trip to California on Saturday, April 26, 2008, to meet up with Mercado's uncle who was, in turn, going to put them in touch with someone from whom they could buy

drugs. Coded language was used which referred to a "nice table" and a numeric reference to "two to four." Based on his training and experience, Middlebrook believed Mercado and Reyes were discussing buying several kilos of cocaine.

Based on these intercepted phone calls, Middlebrook and his unit set up surveillance on Reyes' home at 6250 Maxwood Court in Las Vegas, Nevada, early in the morning on April 26, 2008. Reyes was observed leaving his home, getting into an unregistered silver Ford Focus and going to a residence at 907 Carnival in Las Vegas, Nevada. Investigators subsequently learned co-defendant Uriarte lived at the Carnival address. Reyes backed out a vehicle from the garage of the Carnival address and then left in a Ford Focus where he was surveilled to a gas station. At the gas station, Reyes met up with two unidentified Hispanic men who were in a Volkswagen Passat. Both cars left the gas station and drove to Reyes' home on Maxwood. Just before Reyes got back to his home, officers observed Mercado arriving at the Maxwood address. Reyes pulled the Passat into the garage and closed the garage door. A short time later, Mercado and Reyes got into the Passat, and the two Hispanic males got into the Ford Focus and drove away. The Passat with Mercado and Reyes in it drove to another gas station where they met up with Manny Razo, a known, high-level drug trafficker. The week prior, law enforcement intercepted a phone call between Razo and Reyes in which Razo was to give Reyes $2,000 to use on the trip to California to buy drugs. Reyes and Mercado then went to another gas station where Reyes opened up the trunk. Surveillance was unable to determine what they were doing. Reyes and Mercado went back to the Carnival address. At the Carnival address, Reyes got into the driver's side of the Passat, Mercado got into the passenger's side, the two unidentified Hispanic males got into the back, and all four men left and headed to California. Surveillance officers followed.

Middlebrook contacted Rowland Acevedo of the Riverside County Sheriff's Office to pick up surveillance of the Passat when it entered California. Detective Acevedo's unit picked up surveillance of the Passat at the Summit Avenue exit in Rancho Cucamonga. Middlebrook was in telephonic contact with Acevedo and provided the license plate and a description of the Passat and its occupants. The Passat was surveilled to an address at 15068 Barwood in La Mirada, California, where the two rear passengers of the vehicle got out and went into the house. One of the two Hispanic male passengers
///

who got out of the Passat was subsequently identified based on surveillance and photographs as defendant Uriarte. Middlebrook identified Uriarte during the hearing.

Reyes and Mercado then drove to a strip mall in Lenox, California, where they met up with two unidentified Hispanic males in another vehicle. Reyes and Mercado followed the vehicle to a residence at 6502 Vinevale Avenue in Bell, California, where a party was occurring. Reyes, Mercado, and the other two men went into the house on Vinevale. A short time later, Reyes left the home, went to the Passat, removed a black duffel bag from the trunk, and reentered the home. A short time later, all four men left the house. Reyes and one of the unidentified Hispanic males got inside the Passat. Mercado and another Hispanic male got inside a white van. Surveillance followed the vehicles to a residence at 8160 Cyprus Avenue in Southgate, California, where Reyes was observed parking the Passat in the garage and shutting the door. Approximately an hour or two later, Reyes and Mercado left the residence in the Passat and drove to the El Pesquador Restaurant where Middlebrook's unit resumed surveillance. From there, Reyes and Mercado were surveilled returning to Las Vegas on Interstate 15.

Middlebrook decided that the vehicle Reyes and Mercado were in would be stopped because based on the investigation, officers believed drugs were in the car. Middlebrook called the on-duty North Las Vegas sergeant and requested an on-duty patrol unit and a K-9 unit to come out to Jean, Nevada, to assist in the stop. The Passat was stopped for speeding. Middlebrook understood that the driver of the vehicle gave consent to a search of the vehicle. The K-9 alerted, and three kilos of cocaine were discovered in a hidden compartment under the rear seat. Middlebrook subsequently assisted in a further search of the Passat pursuant to a state search warrant.

The following day on April 27, 2008[1], members of his unit went to the Carnival Street address to make contact with the occupants. Middlebrook went to the 907 Carnival address after Uriarte gave consent to search the home. The initial search of the home revealed a large amount of money and owe sheets, *i.e.*, ledgers drug dealers keep to show who owes them money for drugs provided. One of the names on the owe sheet was "Javier" whom officers believed was Javier Reyes. At some point, a

---

[1] The surveillance was conducted until the early morning hours of April 27, 2008 when the Passat occupied by Reyes and Mercado was stopped in Jean, Nevada.

5

telephonic search warrant was obtained, and an additional four kilos of cocaine and a large amount of money was recovered.

On cross examination, Middlebrook testified that during the week the wiretap was up, he did not believe that any investigators heard the name "Omar" or had identified Uriarte in any of the calls. Prior to April 26, 2008, the 907 Carnival address was not an address "of interest." On April 26, 2008, Middlebrook did not witness any sales occurring at the Carnival address. The Passant was eventually stopped in Jean, Nevada. At the time of the stop, only Reyes and Mercado were in the vehicle. Officers Hudson, Skipworth, and Hickman were already inside when Middlebrook arrived at Uriarte's house. Consent was given, the house was "locked down," and a telephonic search warrant was being obtained. Middlebrook was not present when Uriarte allegedly gave consent to search the home.

### B. Testimony of Officer Jim Hudson

Officer Hudson has been employed by the NLVPD for ten years. For the past four and a half years, he has been a narcotics investigator. He was involved in the investigation of co-defendant Reyes and aware of the Title III interceptions concerning a trip to California on April 26, 2008. He was not personally involved in any of the surveillance or the activities that occurred on April 26 and the early morning of April 27, 2008. However, he learned about the results of the surveillance and that approximately three kilos had been recovered from the Passat after a traffic stop in Jean. Officers learned about the 907 Carnival address based on surveillance conducted on April 26, 2008. Several persons involved in the surveillance were observed at the 907 Carnival address, and this was the last place individuals were surveilled leaving before they went to California. It is standard procedure for officers to do a "knock and talk" at a residence where activities of this nature are observed because there may be more drugs, money, or other evidence of a crime at the residence. On April 27, 2008, he went with Investigators Skipworth and Hickman to 907 Carnival. All three officers were dressed casually in plain clothes, and although armed, their weapons were concealed. However, all three officers had their police badges displayed.

Around 9:00 p.m., the officers knocked on the door, and Uriarte answered. Skipworth attempted to communicate with Uriarte but realized that Uriarte did not appear to speak English. The
///

officers wanted to ask for consent to search and realized that the consent would not be valid if Uriarte did not understand. Accordingly, Investigator Hickman called a Spanish-speaking officer, Officer Jose Garcia, to communicate with Uriarte in Spanish. Garcia spoke with Uriarte for a short period of time on the phone, and Uriarte handed Hudson the phone back. Hudson took the phone from Uriarte and spoke with Garcia who said that "you guys are good to go," relating that Uriarte was going to sign a consent to search for his house. Garcia told Hudson that Uriarte told Garcia that the Passat that Reyes was driving belonged to Uriarte. Garcia also told Hudson that he explained to Uriarte that the officers would be giving him a written consent to search form.

While Hudson was talking with Garcia on the phone, Uriarte went back inside his home, closed the door, and Hudson could hear the deadbolt lock behind him. Hudson thought this was odd but recognized Uriarte "had the right to do this." This put Hudson in an awkward position because he had never had anyone do this before. He reiterated that he understood "they have the right to walk away." Hudson explained to Garcia that Uriarte walked back in the house and locked the door behind him. It was kind of humorous to Hudson because this had never happened to him before. The officers waited outside, asking themselves "what do we do next?" The officers waited a few minutes and then knocked on the door. About a minute after that, Uriarte opened the door and was breathing very hard and sweating profusely. Uriarte swung the door completely open and made a gesture to the officers as if to "come in" and lowered his head. Uriarte made a sweeping motion across his body while opening the door, gesturing for the officers to come in. Uriarte did not indicate at any point that he wanted the officers to stop.

The officers entered and initially determined that there were two adult women, an adult male, and a small child in the home. They were all asked to come out of the bedrooms and politely directed to the couch. Investigator Skipworth attempted to speak to the occupants in Spanish. They were directed to the livingroom where the T.V. was on, and they all stayed there while the officers began their search. No one was handcuffed.

Before the search was begun, Hudson approached Uriarte who was sitting on the couch and handed him the consent to search form. Uriarte appeared to read the form and signed it. Hudson
/ / /

provided Uriarte with a standard consent to search form which is in both English and in Spanish. Uriarte signed the Spanish portion of the form. Skipworth was standing close by and observed Uriarte sign the consent to search form. The NLVPD's standard consent to search form was marked and admitted as Government's Exhibit "1." It is the same form that Uriarte signed on April 27, 2008. Hudson does not have the form that Uriarte signed and does not know what happened to it. The last time he saw the signed form was on the coffee table in Uriarte's livingroom. Hudson believed he accidentally left the signed consent to search form on the coffee table. At the time Uriarte signed the form, he was not under arrest, had not been handcuffed, and had not been read his *Miranda* rights. None of the officers had their guns drawn.

      After the consent to search form was signed, Hudson walked into the master bedroom and noticed items in the closet, specifically, cash wrapped in plastic or a ziplock bag. Next to it was a kid's jack-o-lantern used for trick-or-treating. He took them down, looked inside, and found a large amount of cash, almost $90,000. Paperwork and notebooks which appeared to be "owe sheets" were also found in the closet. Other owe sheets were discovered in the kitchen. Once they discovered these items, the officers decided to "play it safe" and get a search warrant. Hudson testified it was their standard procedure to apply for a telephonic search warrant after confirming they were not wasting their time in a knock and talk. Investigator Skipworth prepared the paperwork and applied for the search warrant which was granted. After the search warrant was granted, additional officers and a K-9 officer were brought in to conduct the search. Officer Nellis brought his drug dog Mack through the house, and the dog alerted on one of the bedrooms, under one of the children's bed. The mattress was lifted up, and officers discovered what appeared to be four kilos of cocaine.

      On cross examination, Hudson testified that no application was made for a search warrant prior to the time officers arrived at 907 Carnival to do a "knock and talk." It was clear from the officer's initial contact with Uriarte that there was a language barrier. The consent to search form was not handed to Uriarte outside his home but only when he went inside. Inside the home were two adult females, an adult male, and a child. At no time did Hudson tell Uriarte that if he did not give consent to search, the females would be arrested. Hudson did not hear anyone else say this to Uriarte. Hudson did
///

1  not tell Uriarte that if he did not sign the consent to search form that CPS would be called for the minor
2  child. Hudson did not hear anyone else say this to Uriarte. Hudson acknowledged that the consent to
3  search form Uriarte signed was an important piece of evidence and that he did not have it. The
4  application for the telephonic search warrant was made after the money was found.

5        In response to questions from the court, Investigator Hudson testified that when he, Skipworth,
6  and Hickman knocked on the door, it was immediately apparent that Uriarte was not fluent in English.
7  Skipworth spoke the best conversational Spanish among the three of them and seemed to be doing a
8  pretty good job of communicating with Uriarte. However, it appeared that Uriarte may not have
9  completely understood, and Hudson understood that Skipworth's non-fluency in Spanish could be
10 challenged later on. For this reason, a Spanish-speaking officer was called on the phone and spoke with
11 Uriarte. Garcia and Uriarte spoke, and Uriarte handed the phone to Hudson. Garcia told Hudson that
12 "you guys are good to go" and could go ahead and do the search. Hudson asked Garcia if Garcia had
13 explained the consent to search form to Uriarte. Garcia responded that he had. While Hudson was
14 speaking with Garcia on the phone, Uriarte walked away, walked into his house, and locked the
15 door behind him. The officers paused to decide what to do for approximately two minutes until
16 Skipworth knocked on the door. Hudson stood approximately ten feet away from the door to the side,
17 watching the front window. Hudson testified that the officers did not know whether there was a
18 misunderstanding or whether possibly Uriarte was going back into the residence to retrieve a weapon.
19 Hudson decided to play it safe first, so he kept an eye on the window. Skipworth knocked on the door
20 in a regular manner. He did not announce himself as a police officer or demand entry. Uriarte
21 answered the door in about a minute. Uriarte was sweating profusely, and Hudson concluded that
22 Uriarte may have been "hustling" something inside the house. Hudson described Uriarte's demeanor
23 when he answered the door and gestured the officers in as "defeated." Uriarte looked down and would
24 not make eye contact. He described it as a "give-up attitude, like you got me."

25       On redirect examination, Hudson testified that a Spanish-speaking officer, Gomez, later arrived
26 at the scene and spoke with Uriarte. Uriarte initially told Gomez that he shut the door to use the
27 / / /
28 / / /

1  bathroom.  When Gomez appeared incredulous at this response, Uriarte told Gomez that he had moved
2  the drugs from the garage into the child's bedroom.  Uriarte spoke with Gomez after he received
3  *Miranda* warnings and signed a written waiver.

   **C.**  **Testimony of Officer Jose Garcia**

   Officer Garcia is a police officer with NLVPD currently assigned to Special Operations, or the SWAT team.  Prior to that, he worked in the Narcotics Unit for five years.  He was involved in the investigation of Javier Reyes in an undercover capacity.  He participated in the surveillance of Reyes and Mercado that resulted in their traffic stop and subsequent arrest on April 27, 2008 and in the surveillance of the 907 Carnival address.  He was aware that members of his unit intended to do a "knock and talk" at that residence following the arrest of Reyes and Mercado.  Garcia was doing followup investigation at NLVPD while investigators Hudson, Hickman, and Skipworth went to 907 Carnival.  Hickman called Garcia, indicating the officers had made contact with a Hispanic male at 907 Carnival and were having difficulty communicating with him because he spoke Spanish.

   Garcia testified that Spanish is his first language, and he speaks it fluently.  The man identifying himself as Felix Uriarte told Garcia he lived at 907 Carnival.  Garcia asked Uriarte if anyone else lived at the residence, and Uriarte responded that his wife and child lived there also.  Garcia told Uriarte that officers were there to conduct a followup narcotics investigation and that a dark-colored Volkswagen Passat was seen leaving his residence the day prior.  Garcia told Uriarte that the vehicle was stopped, and as a result of that stop, narcotics were found.  Uriarte responded that the vehicle was his and that he had lent it to a friend.  Garcia informed Uriarte that a large quantity of narcotics were recovered from a hidden compartment in the vehicle.  Garcia asked Uriarte if he was aware that the vehicle had a hidden compartment.  Uriarte responded that he had bought it at an auction and became aware that it had a hidden compartment after he bought it.  Garcia asked Uriarte if he would give permission for the officers to enter his house and to search for narcotics.  Uriarte indicated he would consent.  Garcia explained that the officers would provide him a written consent form.  When Uriarte told Garcia he would consent to a search of his house, Garcia asked Uriarte to hand the phone to one of the investigators.  Garcia did not tell Uriarte that if he failed to consent, a search warrant would be

///

1   obtained.  Garcia did not tell Uriarte that his family members would be arrested if he failed to consent.
2   Garcia did not tell Uriarte that his children would be taken to CPS if he failed to consent.
3       Garcia spoke to Investigator Hudson and informed Hudson that Garcia had consented to search
4   the residence.  Much later, Garcia went to 907 Carnival after someone else in the unit had obtained a
5   search warrant.  The rest of the Narcotics Unit was searching the house.  Officer Gary Nellis informed
6   Garcia that there was a Nissan Quest parked in the driveway.  Nellis told Garcia that he believed there
7   was a hidden compartment in the Nissan Quest and that his dog had alerted to the vehicle.  Garcia
8   spoke with Uriarte and told him that officers were aware the Nissan had a hidden compartment in it and
9   asked Uriarte how to open it.  Garcia understood that Uriarte had been advised of his *Miranda* rights
10  and had signed a written waiver of rights form before Garcia asked Uriarte these questions.  Garcia
11  escorted Uriarte to the driveway where the car was parked and asked Uriarte if he would show how to
12  open the compartment.  Uriarte bent down underneath the passenger side and opened a factory box.
13  Garcia told Uriarte that officers knew this was not the hidden compartment and that it needed to be
14  opened through the glove box.  Uriarte then showed the officers how to open the secret compartment
15  and explained how it was operated.  It was a very sophisticated system.
16      On cross examination, Garcia testified that while on the phone with Uriarte, Garcia asked if
17  Uriarte would consent to search his home for narcotics and that if Uriarte agreed, he would need to sign
18  the form.  Garcia did not go over the rights on the form with Uriarte on the phone and did not advise
19  Uriarte that he had the right to refuse to consent.
20      **D.    Testimony of Officer Shane Skipworth**
21      Officer Skipworth has been employed with NLVPD for approximately eight and a half years and
22  has been a narcotics investigator for approximately a year and a half.  He was involved in the Javier
23  Reyes investigation and participated in surveillance on April 26 and April 27, 2008.  He was one of
24  three investigators who went to 907 Carnival on the evening of April 27, 2008 to do a followup
25  investigation or "knock and talk."  Hudson and Skipworth approached the door and knocked.  A man
26  identifying himself as Omar Felix Uriarte answered.  The officers attempted to speak with him in
27  English at first, but he spoke little English.  Skipworth speaks some Spanish and spoke with Uriarte, but
28  the decision was made to call a Spanish-speaking officer, and Uriarte spoke with Garcia on the cell

11

phone. After Uriarte spoke with Garcia, he handed the phone back to Investigator Hudson. Garcia informed Hudson that Uriarte was consenting to a search of his residence. Uriarte excused himself to use the bathroom and went inside the house and closed the door. Skipworth testified "we thought he's not coming back to the door." About a minute later, they knocked on the door, and Uriarte answered and invited them in. When officers knocked the second time, they did not announce their presence or demand that he open the door. When Uriarte opened the door, he stood to the side and made a motion for the officers to enter. When Uriarte returned to the door, he was visibly nervous and sweating.

When officers entered the house, they were immediately in the livingroom. They asked Uriarte who else was in the house and did a quick sweep of the premises for officer safety. There was another adult male, two adult women, and perhaps a child in the house. The occupants were asked if they would sit down in the livingroom. Everyone was polite and did so. Uriarte was presented with a written consent to search form which is in both English and Spanish. Uriarte filled it out. Skipworth asked Uriarte in Spanish whether he had any questions and whether he understood the form, and Uriarte said he understood. Skipworth observed Uriarte sign the form. Uriarte appeared to review the form and read it before signing it. Skipworth did not tell Uriarte that a search warrant would be obtained if he did not sign or that his family members would be arrested if he did not sign. Skipworth was aware that the form has been misplaced and believes it was left behind in the residence.

After Uriarte signed the form, the officers began to search. Hudson and Skipworth went into the master bedroom. Hudson found a large amount of money and some ledgers or owe sheets. After these items were found, the decision was made to apply for a telephonic search warrant. Skipworth included information learned from the initial search, as well as Uriarte's statement to Garcia, acknowledging Uriarte was aware of the concealed compartment in the Passat to support the search warrant application. A copy of the duplicate original search warrant Skipworth applied for and obtained was marked and admitted as Government's Exhibit "2." Skipworth made the application to Judge Natalie Tyrell of North Las Vegas Justice Court at approximately 11:20 p.m. The search was resumed after the search warrant was obtained. Approximately four kilos of cocaine were found under the mattress in the child's bedroom.

///

1   Skipworth testified that he participated in the surveillance of the trip to California on April 26 and April 27, 2008. Based on his surveillance and photographs taken during the surveillance, he knows that Uriarte was one of the four men in the Volkswagen Passat who traveled to and from California.

**DISCUSSION**

The Fourth Amendment secures "the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." U.S. Const. amend. IV. The Fourth Amendment protects reasonable and legitimate expectations of privacy. Katz v. United States, 389 U.S. 347 (1967). The Fourth Amendment protects "people not places." Id. Evidence obtained in violation of the Fourth Amendment and evidence derived from it may be suppressed as the "fruit of the poisonous tree." Wong Sun v. United States, 371 U.S. 471 (1963). "It is well settled under the Fourth and Fourteenth Amendments that a search conducted without a warrant issued upon probable cause is '*per se* unreasonable . . . subject only to a few specifically established and well-delineated excepts.'" Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973), quoting Katz, id. "It is equally well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted to pursuant to consent. Id.

It is undisputed that on April 27, 2008, three NLVPD plain clothes officers went to Uriarte's residence at 907 Carnival to conduct a "knock and talk" with the occupants of the residence and conduct a followup investigation. The Ninth Circuit has long held that "[l]aw enforcement officers may encroach upon the curtilage of a home for the purpose of asking questions of the occupants." United States v. Hammett, 236 F.3d 1054, 1059 (9th Cir. 2001). In United States v. Davis, the court explained,

> Absent express orders from the person in possession against any possible trespass, there is no rule of private or public conduct which makes it illegal per se, or a condemned invasion of the person's right of privacy, for anyone openly and peaceably, at high noon, to walk up the steps and knock on the front door of any man's 'castle' with the honest intent of asking questions of the occupant thereof–whether the questioner be a pollster, a salesman, or an officer of the law.

327 F.2d 301, 303 (9th Cir. 1964). The uncontroverted testimony in the record is that the officers knocked on the door, and Uriarte answered. Investigator Skipworth attempted to communicate with Uriarte in Spanish. When it became evident he was not fluent in English, Skipworth called a Spanish-speaking officer to speak with Uriarte. Garcia spoke with Uriarte on the telephone and explained that

1  the black VW Passat seen the day before during surveillance at his residence had been stopped and
2  cocaine found inside.  Garcia asked for Uriarte's verbal consent to search his residence for narcotics,
3  and Garcia verbally consented.

4        After Garcia spoke with Uriarte, the phone was handed back to Investigator Hudson.  Garcia
5  told Hudson that Uriarte had consented to a search of his home for narcotics and was willing to sign the
6  written consent to search form.  Hudson and Skipworth both testified that Uriarte signed the standard
7  NLVPD consent to search form on the portion of the form that was written in Spanish.  The form was
8  marked and admitted as Government's Exhibit "1."  Skipworth testified that he asked Uriarte in
9  Spanish whether he had any questions and understood the form and that Uriarte acknowledged he
10 understood.  The court interpreter verified on the record that the Spanish words Skipworth used to
11 inquire whether Uriarte understood or had any questions were accurately translated.  The court found
12 Hudson and Skipworth credible that Uriarte received the written consent to search form, appeared to
13 read it, and signed the Spanish portion of the form.

14     **A.**    **Consent to Search.**

15       A search conducted without a warrant does not offend the Constitution "if conducted pursuant
16 to the valid consent of a person in control of the premises."  United States v. Patayan Soriano,
17 361 F.3d 494, 501 (9th Cir. 2004) (citing Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973));
18 United States v. Kaplan, 895 F.2d 618, 622 (9th Cir. 1990).  It is the government's burden to
19 demonstrate that consent to a warrantless search was voluntary.  Id.; see also United States v. Matlock,
20 415 U.S. 164, 170 (1974); Schneckloth v. Bustamonte, 412 U.S. 218 (1973).  Whether consent to
21 search was voluntary and intelligent is a question of fact, and its resolution depends upon the totality of
22 the circumstances.  Id.; United States v. Cormier, 220 F.3d 1103, 1112 (9th Cir. 2000) (citing United
23 States v. Morning, 64 F.3d 531, 533 (9th Cir. 1995), cert. denied, Morning v. United States,
24 516 U.S. 1152 (1996)).  The Ninth Circuit "considers the following five factors in determining whether
25 a person has freely consented to a search: (1) whether defendant was in custody; (2) whether the
26 arresting officers had their guns drawn; (3) whether Miranda warnings were given; (4) whether the
27 defendant was told he had the right not to consent; and (5) whether the defendant was told that a search
28 warrant could be obtained."  United States v. Crasper, 472 F.3d 1141, 1149 (9th Cir. 2007); Cormier,

220 F.3d at 1112 (citing, United States v. Castillo, 886 F.2d 1071, 1082 (9th Cir. 1988). See also United States v. Chan-Jimenez, 125 F.3d 1324 (9th Cir. 1997).

      None of these factors is the *sine qua non*, they are simply factors. Id. When viewing the surrounding circumstances, "there is no single controlling criterion." Kaplan, 895 F.2d at 622 (quoting United States v. Agosto, 502 F.2d 612, 614 (9th Cir. 1974) (per curiam)). The Ninth Circuit has found that it is not necessary to "check off" all five factors, but "many of this court's decisions upholding consent are supported by at least several of the factors." Payatan Soriano, 361 F.3d at 502 (citing United States v. Chan-Jiminez, 125 F.3d 1324, 1327, n.3 (9th Cir. 1997)); Morning, 64 F.3d 531, 533 (stating "although we have established theses factors to aid in the decision making process, the full richness of every encounter must be considered....Every encounter has its own facts and its own dynamics. So does every consent").

      Applying these factors, the court finds that Uriarte voluntarily consented to a search of his home. At the time of the search, Uriarte was not in custody, and at no point during the encounter did the officers have their guns drawn. Uriarte did not receive *Miranda* warnings until after the drugs were found, however, because he was not in custody, *Miranda* warnings were not required. The written consent to search form which the court finds Uriarte received, read, and signed, explicitly advised him that he had the right to refuse to consent to the search and to refuse to sign the form. Uriarte's written motion claims that he was told a search warrant could be obtained if he refused to consent. There is nothing in the record to support this claim.

      Although Uriarte's written motion asserts he was threatened by the officers, there is also nothing in the record to support his unsubstantiated allegations. The court found Hudson and Skipworth credible that they did not threaten Uriarte with arresting his family or calling CPS to take his child. Uriarte's written motion also claims that he merely acquiesced to the officers' show of authority in allowing them into his home. However, the record refutes this assertion. The undisputed testimony of Hudson and Skipworth is that while Garcia was still talking with Hudson after speaking with Uriarte, Uriarte excused himself, went back into the house, and closed and locked the door. Both Hudson and Skipworth used different expressions, but both stated, in effect, that they were surprised by this conduct and did not initially know how to respond. Both officers recognized that Uriarte had the right to walk

1   away. The court found the officers credible, that after deciding what to do for one or two minutes, one
2   of the officers knocked on the door in a normal manner without demanding entrance or announcing
3   their presence as police officers. Uriarte came back to the door, opened it, and admitted the officers by
4   standing to the side of the door and gesturing for them to come in.

5       The court finds that Uriarte's conduct in closing and locking the door while speaking with the
6   officers illustrates his awareness that he had the right to refuse their request to search him home. The
7   officers' response to being denied entry demonstrates their recognition of his right to walk away and
8   refuse to permit the search and belies any suggestion that coercive police conduct overbore Uriarte's
9   will.

10      The loss of the written consent form is troublesome. Hudson acknowledged that it was an
11  important piece of evidence that was not recovered. However, Middlebrook, Skipworth, and Hudson
12  all testified that they last observed the written consent to search form on the coffee table where Uriarte
13  was sitting during the search of his home, and the court believed the officers that Uriarte received the
14  written consent to search form, appeared to read it, and signed it. The court finds that under the totality
15  of the circumstances presented, the government has met its burden of demonstrating that Uriarte
16  voluntarily consented to a warrantless search of his residence.

17      **B.**    **Validity of the Search Warrant**

18      The NLVPD investigators in this case decided to apply for a state telephonic search warrant
19  after entering Uriarte's residence and finding a large amount of cash and owe sheets in the closet of the
20  master bedroom and owe sheets in the kitchen. Investigator Skipworth's affidavit which supported the
21  search warrant application was based in large part upon the followup investigation conducted at
22  Uriarte's residence on April 27, 2008, Uriarte's statements to the investigators, and the evidence
23  initially recovered pursuant to Uriarte's consent to search. Uriarte argues that the officers cannot rely
24  upon anything they learned during the search of his residence to support the search warrant because he
25  merely acquiesced to the officers' presence and did not give a valid consent to search.

26      It is well established that officers may not rely upon evidence obtained in violation of the Fourth
27  Amendment to establish probable cause to justify a search. United States v. Roberts, 747 F.2d 537, 541
28  (9th Cir. 1984). However, the court has found that Uriarte voluntarily consented to a search of his

residence.  Therefore, the officers were lawfully in the residence pursuant to a valid consent to search at the time they observed the large amount of cash and owe sheets in the master bedroom and the owe sheets located in the kitchen.  Uriarte told Garcia over the phone that he owned the VW Passat in which the cocaine was recovered and that he was aware after he purchased the vehicle at auction that it contained a hidden compartment.  Uriarte does not claim that the telephonic affidavit failed to establish probable cause that the items sought to be searched for and seized would be found in the searched premises.  Rather, he asserts the officers were not legally in his home at the time they conducted the initial search and obtained inculpatory statements from him.  Neither Uriarte's statements nor the evidence observed during the consent search of the premises were the product of an illegal search and seizure.  Thus, the exclusionary rule does not apply, and suppression is not required under the "fruit of the poisonous tree" doctrine.

**CONCLUSION**

The court finds the government has met its burden of establishing Uriarte gave a valid voluntary consent to search his residence.  Uriarte made inculpatory statements acknowledging he was the owner of the VW Passat and aware that it had a hidden compartment while speaking with Garcia over the phone while Garcia was requesting consent to search.  Uriarte does not claim that he was in custody or that *Miranda* warnings were required.  The officers were lawfully on the premises conducting a consensual search when they elected to obtain a telephonic search warrant.  Because they were in the home pursuant to a valid consent to search, Uriarte's Fourth Amendment rights were not violated when the affiant of the search warrant included information derived from the initial search and questioning of Uriarte in support of the application.

For all of the foregoing reasons,

**IT IS THE RECOMMENDATION** of the unsigned United States Magistrate Judge that the Motion to Suppress (Dkt. #70) be DENIED.

Dated this 15th day of April, 2009.

_____
PEGGY A. LEEN
UNITED STATES MAGISTRATE JUDGE